**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(SOUTHERN DIVISION)**

| | | |
|---|---|---|
| PASADENA BOAT WORKS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CAROLINA SKIFF, LLC, | ) | Civil Case No. GLS 20-1414 |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

**MEMORANDUM OPINION**

Pending before the Court is "Defendant's Motion for Partial Summary Judgment" and memorandum of law in support thereto (ECF Nos. 69, 69-2), filed by Defendant Carolina Skiff, LLC ("Defendant"). The matter has been fully briefed, *see* ECF Nos. 70, 104, so no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2023).

For the reasons set forth below, the Motion is **DENIED IN PART, GRANTED IN PART**.

## I.   BACKGROUND

### A.  Procedural Background

On April 21, 2020, Plaintiff Pasadena Boat Works, LLC ("Plaintiff") filed the Complaint against the Defendant in the Circuit Court for Anne Arundel County. (ECF No. 2). In the Complaint, the Plaintiff alleged the following: Count I, Breach of Contract, in violation of Maryland law; Count II, Breach of Express Warranty, in violation of the Uniform Commercial Code as adopted in Maryland, Md. Code, CL ("UCC") § 2-313; Count III, Breach of Implied Warranty, in violation of UCC § 2-314; Count IV, Fraudulent Misrepresentation, in violation of Maryland law; Count V, Negligent Misrepresentation, in violation of Maryland law. (*Id.*).

On June 10, 2020, Defendant filed a motion to dismiss the Complaint. On the same day, Defendant filed an Answer to the Complaint, which included a Counterclaim that asserted the following: Count I, Defamation, in violation of Maryland law; Count II, Defamation *per se*, in violation of Maryland law; Count III, Tortious Interference with Prospective Contractual Relations, in violation of Maryland law; and Count IV, Breach of Contract, in violation of Maryland Law. (ECF No. 11).

On June 24, 2020, Plaintiff filed an Amended Complaint, maintaining the same causes of action as set forth in the Complaint. (ECF No. 15). On the same day, Plaintiff filed a letter response in opposition to Defendant's request to file a motion to dismiss. (ECF No. 16). On July 1, 2020, Plaintiff filed an Answer and an Amended Answer to Defendant's Counterclaim. (ECF Nos. 17, 19). On July 8, 2020, Defendant filed an Answer to Plaintiff's Amended Complaint, and re-asserted its Counterclaim. (ECF No. 21).

On August 20, 2020, Chief Judge James K. Bredar issued an Order granting in part, denying in part, the Defendant's motion to dismiss. (ECF Nos. 27, 28). Specifically, Chief Judge Bredar dismissed Count IV, Fraudulent Misrepresentation, of the Amended Complaint. (ECF No. 28).

On August 25, 2020, Defendant filed an amended Counterclaim, which raised the same causes of action as the original Counterclaim, but added additional Defendants, Nick Doetsch and Rick Levin. (ECF No. 32). On October 5, 2020, Mr. Doetsch and Mr. Levin filed an Answer to the Counterclaim filed against them. (ECF No. 35).

On October 21, 2020, the matter was referred to Magistrate Judge J. Mark Coulson for all further proceedings with the consent of the parties. (ECF Nos. 37-39). On October 26, 2020, the case was reassigned to Magistrate Judge Beth P. Gesner for all further proceedings. (ECF No. 41).

On December 14, 2020, Plaintiff filed the Second Amended Complaint. (ECF No. 47).  On January 4, 2021, Defendant filed an Answer to the Second Amended Complaint. (ECF No. 48). On May 20, 2021, the case was reassigned to Judge Deborah L. Boardman for all further proceedings. (ECF No. 51).

On July 29, 2021, the Plaintiff filed a motion seeking leave to file the Third Amended Complaint, which the Defendant opposed. (ECF Nos. 58, 66; *see also* ECF Nos. 67-68, 82, 83).[1] On August 30, 2021, the case was reassigned to the undersigned for all further proceedings.

On September 20, 2021, Defendant filed its motion for partial summary judgment and memorandum of law in support thereto (collectively the "Motion").  (ECF No. 69). On October 4, 2021, the Plaintiff filed an Opposition to the Motion. (ECF No. 70, "Opposition"). On October 5, 2021, the district judge then-assigned to the case issued an order staying all briefing related to the Motion until the completion of a then-pending settlement conference. That settlement conference was cancelled by the U.S. Magistrate Judge per the request of the parties. (ECF Nos. 72, 75).

Thereafter, on March 28, 2022, the Court presided over a motions hearing related to Plaintiff's motion for leave to file a Third Amended Complaint.  (ECF Nos. 81, 85, 105). During the hearing the Court entertained extensive argument from the parties and made several factual findings and issued several rulings. (*Id.*). Following the hearing, the Court issued an Order ultimately deferring ruling on whether to grant or deny the motion for leave, and denied as premature the Motion until after the completion of mediation.  (ECF No. 84). On June 17, 20, and 23, 2022, several settlement conferences were held, however mediation was ultimately unsuccessful. (ECF Nos. 87-89).

---

[1] The motion is mistakenly labeled as a motion seeking leave to file a second amended complaint. However, as the record reflects, prior to filing the motion, the Plaintiff had already filed the Second Amended Complaint. (*See* ECF No. 47).

On September 16, 2022, the Court presided over another motions hearing, during which it issue further rulings on the Motion. (ECF No. 91). Following the hearing, the Court issued an Order directing the parties to file supplemental briefing related to Plaintiff's motion seeking leave to file a Third Amended Complaint. The Court also held that the Motion was now ripe and ordered additional briefing related thereto. (ECF No. 92).

Subsequently, the parties filed supplemental briefs related to the Plaintiff's motion seeking leave to file a third amended complaint. (ECF Nos. 102-103). The Defendant also filed a reply brief in support of the Motion. (ECF No. 104, "Reply").[2]

### B. Factual Background[3]

Defendant is a company devoted to designing and manufacturing boats. (Second Amended Complaint, ¶ 10). Defendant began selling boats and related equipment to Plaintiff in 2015 after the parties vetted each other's capabilities. (ECF No. 70-1, Affidavit of Nicholas Doetsch, "Doetsch Aff.," ¶ 3). The parties entered into contracts that operated on a year-to-year basis, which designated Plaintiff as an "authorized dealer" of Defendant's products. (ECF No. 69-4, Deposition of Nicholas Doetsch, "Doetsch Dep.," 21:16-22:5, 47:20-48:7; *see also e.g.*, ECF Nos. 69-6, 70-6 the "Agreement"). Under the Agreement, Plaintiff committed to selling Defendant's boats in exchange for discounted pricing. (*See* ECF Nos. 69-6, 70-6; *see also* ECF No. 70-4, Deposition of Tony Horn, "Horn Dep.," 66:6-14).

When the parties first began their business relationship in 2015, Plaintiff invested hundreds of thousands of dollars into its facilities and operations in order to become a "top [authorized]

---

[2] By separate Order, the Court denies Plaintiff's motion for leave to file a Third Amended Complaint.

[3] The Court construes all factual evidence in the light most favorable to Plaintiff, the nonmoving party. *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021).

dealer." (Doetsch Aff. ¶ 8). According to the Agreement, Defendant could terminate the dealership program at any time. (ECF Nos. 69-6, 70-6).

Between 2015 and 2019, Plaintiff sold over three hundred of Defendant's boats. (Doetsch Aff. ¶ 9). To sell Defendant's products, Plaintiff would attend boat shows in Maryland and elsewhere. (Doetsch Aff. ¶ 9). In 2019 Defendant announced a new boat model, which it intended on showing to its authorized dealers at its annual "Dealer Meeting." (Doetsch Dep. 67:6-20). Defendant notified its authorized dealers of the Dealer Meeting by sending them a letter that detailed the schedule of the Dealer Meeting. (ECF No. 70-5). In the letter, Defendant thanked the authorized dealers for their "business and partnership." (*Id.*). During the Dealer Meeting, which began June 23, 2019, Defendant hosted its various authorized dealers for dinner, drinks, and provided presentations about its new and old products. (Doetsch Dep. 67:6-68:16). Nicholas Doetsch, who co-owns Plaintiff with Rick Levin, attended the Dealer Meeting. (Doetsch Dep. 67:6-12). At the Dealer Meeting, Defendant had sixty-seven (67) product lines on display. (Doetsch Dep. 69:1-5).

One of the products presented at the Dealer Meeting was the 2020 Liner Series boat, which was supposed to be equipped with a "self-bailing" feature. (Doetsch Dep. 68:8-12). Self-bailing boats are unique because the operator of the boat does not need to assist in the removal of water from the deck. (Doetsch Dep. 54:17-55:3). However, none of the authorized dealers had the opportunity to water test the 2020 Liner Series boats at the Dealer Meeting. (Horn Dep. 100:10-22). Also, although Defendant is a member of the National Marine Manufacturers Association ("NMMA"), none of the boats that were presented at the Dealer Meeting were affixed with a NMMA label, which are intended to communicate that a particular boat complies with American

Boat & Yacht Council ("ABYC") standards. (ECF No. 69-5, Affidavit of Robert Bass, "Robert Bass Aff.," ¶ 5).

Mr. Doetsch had very limited information regarding the 2020 Liner Series boats at the time of the Dealer Meeting. (Doetsch Dep. 69:1-8). In fact, prior to attending the Dealer Meeting, Mr. Doetsch had not seen any marketing materials pertaining to the 2020 Liner Series boats. (Doetch Dep. 55:15-56:2).  Prior to leaving the Dealer Meeting, Mr. Doetsch signed the Agreement, which entitled Plaintiff to a discounted rate on Defendant's boats for the 2020 model year, if Plaintiff purchased 45 or more boats. (Doetsch Dep. 76:19-77:4). The Agreement specified that "Carolina Skiff LLC reserves the right to discontinue programs and discounts without prior notice." (ECF No. 69-6, 70-6). Prior to signing the agreement, Mr. Doetsch learned from Defendant's President Joe Kirkland that Defendant's boats were self-bailing. (ECF No. 104-1, Duplicate of Doetsch Dep. 93:2-97:11).

On June 24, 2019, Mr. Doetsch submitted a purchase order for twenty of the 2020 Liner Series boats. (Doetsch Dep. 98:3-6). When placing the order, Mr. Doetsch specifically relied on the fact that the boats were self-bailing and representations by the Defendant that the 2020 Liner Series "is the evolution." (Duplicate of Doetsch Dep. 93:7-13, 97:7-11). Plaintiff's 2020 Liner Series boats arrived in September 2019. (Doetsch Dep. 115:5-16).

In January 2020, Plaintiff attended the "Baltimore Boat Show," where it displayed Defendant's products, including 2020 Liner Series boats. (Doetsch Dep. 103:7-9). At the Baltimore Boat Show, Plaintiff sold "eleven or twelve" of the 2020 Liner Series boats. (Doetsch Dep. 127:5-16). On February 13, 2020, Mr. Bob Brandon, who purchased a 2020 Liner Series boat from Plaintiff, contacted Plaintiff about issues with his boat, specifically that the boat was not self-bailing properly. (Doetsch Dep. 129:8-10). On February 28, 2020, Mr. Doetsch, Mr. Levin, and

Defendant's President Mr. Kirkland had a telephone call regarding the problems with Mr. Brandon's boat. (Doetsch Dep. 156:4-11). During the conversation, Mr. Kirkland offered to buy any 2020 Liner Series boats that were experiencing self-bailing issues back from Plaintiff, which Plaintiff declined. (Doetsch Dep. 157: 15-19). Mr. Levin and Mr. Doetsch ended the call after the conversation became heated and Mr. Kirkland started yelling. (Doetsch Dep. 163-5-9).

On March 2, 2020, Defendant contacted Plaintiff via email to determine whether Plaintiff intended on accepting an upcoming shipment of 2020 Liner Series boats. (ECF No. 69-7). On March 3, 2020, Plaintiff responded to the email, and informed Defendant that Plaintiff would not be accepting delivery. (*Id.*).

On March 10, 2020, Plaintiff, through counsel, wrote a letter to Mr. Kirkland, directing Defendant to investigate the cause of the self-bailing issues that the Plaintiff asserted the 2020 Liner Series boats were experiencing and rejected the nonconforming boats. (ECF No. 69-8). On March 20, 2020, Defendant, through counsel, wrote a letter to Plaintiff asserting the 2020 Liner Series boats complied with legal and industry standards. (ECF No. 69-10). Defendant also reiterated its offer to repurchase and retrieve the 2020 Liner Series boats. (*Id.*).

On June 19, 2020, Defendant formally terminated its business relationship with Plaintiff. (Doetsch Dep. 256:18-257:3). In October 2020, Defendant repurchased eleven (11) 2020 Liner Series boats from Plaintiff and returned the full purchase price to Plaintiff. (Robert Bass Aff. ¶ 6).

## II.   STANDARD OF REVIEW—SUMMARY JUDGMENT

Motions for summary judgment shall be granted only if there are no genuine issues as to any material fact, such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the burden of showing that there is no genuine

issue as to any material fact.  Fed. R. Civ. P. 56(a); *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987) (internal citation omitted). The burden can be satisfied through the submission of, e.g., pleadings, depositions, answers to interrogatories, admissions, and affidavits. *Celotex Corp.,* 477 U.S. at 323; *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir. 1984).

To defeat motions for summary judgment, on the other hand, the nonmoving party cannot simply cast "metaphysical doubt" on the material facts, but rather must provide specific facts demonstrating a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citing Fed. R. Civ. P. 56(e)).

The Court must construe the facts and documentary materials submitted by the parties, including the credibility and weight of particular evidence, in the light most favorable to the party opposing the motions. *Masson v. N.Y. Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson*, 477 U.S. at 255). A "mere scintilla" of evidence is insufficient to create an issue of material fact. *See Barwick*, 736 F.2d at 958–59 (citing *Seago v. North Carolina Theatres, Inc.*, 42 F.R.D. 627, 632 (E.D.N.C 1966)). Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## III.   DISCUSSION

### A.   Summary of Defendant's Arguments

The Defendant advances several arguments, which it believes entitles it to partial summary judgment. First, Defendant asserts that Plaintiff may not recover various categories of damages related to Count I, the breach of contract claim. Second, the Defendant avers that it is entitled to summary judgment as a matter of law on Counts II and III because Plaintiff rejected what it characterizes as "non-conforming goods;" thus, the UCC bars Plaintiff from pursuing claims

against Defendant related to breaches of express or implied warranty. Third, Defendant contends that it is entitled to summary judgment as a matter of law on Count V, the Negligent Misrepresentation claim, and various categories of damages related thereto.

For clarity's sake, the Court has further organized Defendant's arguments below.

### B.  Breach of Contract – Count I

The Defendant first argues that Plaintiff may not recover any damages that stem from Defendant's termination of its business relationship with Plaintiff in June 2020. In particular, Defendant maintains that such damages are not recoverable because Defendant was not contractually obligated to sell Plaintiff its products and was entitled to terminate its business relationship with Plaintiff at any time. Thus, any termination does not constitute a breach of contract. According to the Defendant, then, Plaintiff may not recover any of the following damages relating to the termination of the business relationship: (1) lost profits related to the future sale of Carolina Skiff products that Plaintiff will not be able to realize after June, 2020; (2) the reduced sales of Suzuki motors; (3) inventory of Carolina Skiff boat parts that Plaintiff asserts are now unusable due to Defendant terminating the business relationship between Plaintiff and Defendant; (4) labor hours dedicated to "dealing with Liner Series boats;" (5) costs associated with attending the Baltimore Boat Show; (6) property and expansion costs; (7) lost profits of its service department due to the department working on matters related to Defendant, i.e., "shop service losses;" and (8) lost sales of the "Add-A-Lounge" foldable, stowable chair (collectively hereinafter referred to as "Category Nos."). (Motion, pp. 15-22).

Defendant next asserts that, regardless of whether Defendant had the right to terminate its business relationship with Plaintiff, that Plaintiff is not able to recover certain categories of damages including: first, Category No. (8) listed above (damages related to the Add-a-Lounge

chair), because Plaintiff does not have standing to assert a claim related thereto; second, Category Nos. (1)-(7) listed above, because they are not "reasonably in the contemplation of the parties at the time of the alleged breach of contract, i.e., the above-specified damages are not reasonably foreseeable; third, Category Nos. (1), (4), (7), and (8) listed above, because they are too speculative. (Motion, pp. 15-20; Reply, pp. 4-9).

Finally, Defendant contends that Plaintiff may not recover damages related to Category No. (9), storage fees, because this damages claim is speculative, excessive, not supported by evidence, and unrecoverable as a matter of law. (Motion, p. 28; Reply, pp. 14-15).

For clarity, the Court has created a table related to the damages in connection with Count I:

| Category No. | Damages Sought | Dollar Amount |
|---|---|---|
| (1) | Lost Profits | $1,015,202 |
| (2) | Sales of Suzuki Motors | $44,454 |
| (3) | Unsalable Inventory | $25,000 |
| (4) | Labor Hours | $150,717 |
| (5) | Baltimore Boat Show | $176,061 |
| (6) | Property and Expansion Costs | $56,000 |
| (7) | Shop Service Losses | $28,600 |
| (8) | Add-a-Lounge Lost Sales | $264,500 |
| (9) | Storage Fees | $194,940 |

In the Opposition, Plaintiff counters as follows: (1) an implied-in-fact contract existed between the parties, which required Defendant to sell Plaintiff its product and to do so as part of a "long-term relationship." (Opposition, pp. 19-20). Accordingly, Plaintiff is entitled to recover from the Defendant the damages identified by the Court as Category Nos. (1)-(8); (2) relatedly, Plaintiff

may recover damages identified as Category Nos. (1)-(8), because they are reasonably foreseeable consequences of Defendant's decision to terminate the parties' business relationship in June 2020; (3) Plaintiff has standing to assert a claim related to Category No. (8) because it suffered a direct financial loss stemming from its inability to sell the Add-A-Lounge chair after Defendant improperly discontinued the parties' business relationship; (4) Plaintiff's damages claims related to Category No. (8) are not "speculative;" and (5) Plaintiff's damages claim related to Category No. (9), storage fees, is supported by the evidence and not speculative. (Opposition, pp. 17-26, 30-35).

### C.   Analysis of Breach of Contract Damages: Category Nos. (1)–(8)

As it relates to Count I, Breach of Contract, Plaintiff asserts two separate underlying causes of action: (1) breach of contract related to the nonconforming 2020 Liner Series boats, which did not properly self-bail; and (2) breach of contract related to Defendant's decision to terminate the parties' business relationship in June 2020.

In the Motion, Defendant does not challenge Plaintiff's ability to raise a claim related to the allegedly nonconforming boats. However, Defendant contends that Plaintiff cannot assert a claim related to the termination of the business relationship, or recover damages related to such termination, because: (1) Defendant did not have a contractual obligation to sell Plaintiff its boats; and (2) Defendant had the right to terminate the business relationship at any time. (Motion, pp. 15-21). As a result, Defendant avers, Plaintiff cannot recover damages related to Category Nos. (1)-(8).

In the Opposition, Plaintiff maintains that the longstanding business relationship between the parties established an implied-in-fact contract under which Defendant was obligated to sell

Plaintiff its boats and was obligated to do so as part of a "long-term relationship."[4] (Opposition, pp. 24-25).[5]

As a preliminary matter, the Court finds that a careful review of the Second Amended Complaint reveals that there are no paragraphs that adequately plead that the Defendant, through its conduct, intended to enter into a contractual relationship with Plaintiff beyond what is established in the Agreement. Put another way, the Court finds that Plaintiff failed to adequately plead facts related to an implied-in-fact-contract claim, instead pleading a claim related to the written Agreement. (*See* ECF No. 47, ¶¶ 1-54). As a result, Plaintiff's Second Amended Complaint violates the minimum pleading standard set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

However, even if the Court assumes *arguendo* that there is some construct under which Plaintiff adequately pleaded facts to support an implied-in-fact contract claim, the Court finds that Plaintiff's assertion of an implied-in-fact contract fails as a matter of law. In support of its implied-in-fact contract claim, Plaintiff relies on the following pieces of evidence: (1) Plaintiff and Defendant have had a business relationship since 2015, through yearly contracts such as the Agreement, in which Plaintiff committed to increased boat purchases each year; (2) prior to the

---

[4] Plaintiff does not specify the length of the alleged implied-in-fact contract. Therefore, the Court must assume that Plaintiff is asserting that Defendant was obligated to sell Plaintiff its boats indefinitely. (*See* Opposition, p. 21).

[5] The Court, upon review of the Opposition, finds that the Plaintiff never makes clear whether Plaintiff is also asserting that the written Agreement set forth a contractual obligation for Defendant to sell Plaintiff boats and to do so for a period beyond the "2020 Model Year." (*See* Opposition, pp. 19-22). Assuming, *arguendo* that Plaintiff is raising such argument, it fails for three reasons: (1) the Agreement does not include any language regarding an affirmative obligation on behalf of the Defendant to sell Plaintiff its boats. Instead, even when viewing the Agreement in the light most favorable to Plaintiff, the Agreement sets forth terms that entitle Plaintiff to certain discounts if it commits to purchasing a certain number of boats throughout the year and actually makes those purchases. (*See* ECF No. 69-6, 70-6); (2) the language in the Agreement reflects that Defendant specifically reserved the right to discontinue the program, and, by extension, any obligations created thereunder, *unilaterally and without notice*. (*Id.*) (emphasis supplied); and (3) Mr. Doetsch specifically testified that Plaintiff, in signing the Agreement, committed to purchasing a certain number of boats in exchange for *improved pricing* on any boats actually purchased. (Doetsch Dep. 76:6-77:4) ("We were informed at the meeting that we had to sign [the Agreement] at the meeting in order to *obtain the discount*") (emphasis added).

Dealer Meeting, Defendant's President Joseph Kirkland sent a letter to all attendees in which he thanked them for their "business and partnership;" (3) Defendant's former National Sales Manager, Tony Horn, testified that he believed that, under the Agreement, Plaintiff had an obligation to sell Defendant's boats. (*See* Doetsch Dep. 20:11-21:21; ECF Nos. 70-5; Horn Dep. 66:6-14). Construing these facts in the light most favorable to Plaintiff, the only reasonable inference that the Court can draw is that there was a contractual relationship that lasted from 2015-2019, renewed on a yearly basis, e.g., the Agreement, under which Plaintiff agreed to purchase more boats each year. However, juxtaposed with these facts is testimony from Mr. Horn and Mr. Doetsch. At no point does Mr. Horn testify that the Defendant had an obligation to sell Plaintiff its boats. (*See* Horn Dep. 2:1-5:22, 62:1-69:5, 82:1-101:22). Furthermore, Mr. Doetsch, co-owner of Plaintiff, specifically testified that he understood the contractual relationship between the parties to be governed by the yearly contracts, such as the Agreement:

> Q: I'm interested in the terms of the documentation. Was any documentation that you would consider contractual executed by the parties?
> A: The commitment was for the number of boats. You had to buy 35 boats the first year and commit upfront. And then *if you wanted to continue as a dealership* and obtain the best pricing you had to commit to increases each year thereafter.
> …
> Q: How about the Sea Chaser product line in 2017 – well, 2018? Did you sell Sea Chaser in 2018?
> A: I believe that would have been the year that whatever we had, we would have sold. Then they removed the dealership. But I could have sold a ton of those boats.
> …
> Q: [D]id you believe that Carolina Skiff had an obligation to sell Pasadena Boat Works the Sea Chase product line?
> A: Not for 2019. I would have believed that our contract was setup for the years that we had signed, and they were not renewing us for the following year.

(Doetsch Dep. 20:11-21:21, 46:21-47:7) (emphasis added).

Thus, even when construing these contradictory facts in Plaintiff's favor and attempting to draw logical inferences therefrom, no reasonable juror could find that an implied-in-fact contract

existed between the parties that obligated Defendant to sell Plaintiff its boats at all, let alone for the foreseeable future.

In sum, the Court finds that: (a) Plaintiff failed to adequately plead the existence of an implied-in-fact contract in the Second Amended Complaint; (b) assuming that such implied-in-fact contract was adequately pleaded, when viewing the evidence in the light most favorable to Plaintiff, the conduct of the parties did not give rise to an actionable implied-in-fact contract. Put another way, when viewing the evidence in the light most favorable to Plaintiff, the Agreement did not obligate the Defendant to continue to sell Plaintiff its boats. Relatedly, then, Plaintiff cannot claim the damages identified herein as Category Nos. (1)-(8).

Accordingly, the Motion is granted with respect to damages identified as Category Nos. (1)-(8).[6]

### D.  Analysis of Category No. (9): Storage Fees Damages-Count I.

The final category that Defendant challenges with respect to Count I is Category No. (9), storage fees. The Defendant argues that Plaintiff's claim that it is entitled to $194,940 for storage of the nonconforming 2020 Liner Series boats is "excessive and unrecoverable as a matter of law." (Motion, p. 28). Specifically, Defendant contends that the boats were stored in a lot that Plaintiff does not own, and Plaintiff has failed to put forward any evidence supporting a finding that it has incurred costs related to the storage of the boats. Furthermore, Defendant avers that Plaintiff is seeking storage fees for too large a time frame, as such fees should be limited to "costs incurred from the date PBW rejected delivery, March 10, 2020, to when Carolina Skiff offered to pick them up, March 20, 2020." (*Id.*). Plaintiff argues that the rate represents the legal rate an entity can

---

[6] The Court, in finding that the Defendant did not have an obligation to continue the business relationship, need not and declines to make any findings with respect to the foreseeability of speculative nature of damage Category Nos. (1)-(8).

charge to store a vehicle, pursuant to "Section 21-10A-04(a)(1)(ii) of the Transportation Article," ("the Transportation Article") which allows property owners to charge up to 30 dollars per day to store a vehicle. (Opposition, p. 35).

As a preliminary matter, the Court finds unavailing Plaintiff's reliance on the statutory fee permitted by "Section 21-10A-04(a)(1)(ii) of the Transportation Article." The provision that Plaintiff cites is simply irrelevant. The Transportation Article makes clear that it applies only to a "person who undertakes the towing or removal of a vehicle from a parking lot." The instant dispute does not involve fees related to towing a vehicle from a parking lot. Instead, Plaintiff is alleging damages related to the storage of rejected vehicles. As such, Plaintiff's averment that the Transportation Article sets forth the appropriate measure of its damages for storing Defendant's boats is unfounded.[7]

Instead, the Court finds that Md. Code, COMM. LAW § 2-715 ("Section 2-715")[8] governs the fees that Plaintiff may obtain for the storage of the rejected boats. Section 2-715 provides, in pertinent part, the following:

> Incidental damages resulting from the seller's breach include *expenses reasonably incurred* in inspection, receipt, transportation and *care and custody of goods rightfully rejected*, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

*Id.* (emphasis added). In order for Plaintiff to recover storage fees, pursuant to Section 2-715, Plaintiff must limit its costs to those damages reasonably incurred as a result of storing the rejected 2020 Liner Series boats. To establish the expenses reasonably incurred for storing the rejected

---

[7] In addition, notably, Plaintiff does not cite to a single authority to support its assertion that the Transportation Article is applicable to the instant dispute. (*See* Opposition, p. 38).
[8] This section is also part of the U.C.C., as adopted in Maryland.

boats, Plaintiff must submit evidence, which, as held *supra*, the Court will view in the light most favorable to Plaintiff.

In the Opposition, the Plaintiff asserts that Mr. Doetsch testified to the $194,920 figure, which he calculated by taking the number of boats that Plaintiff had to store and multiplying that amount by a rate of $30/day, in accordance with the fee allowable under the "Transportation Article." (*See* Doetsch Dep. 330:5-333:14)*.* As held above, the $30 per day rate set forth by that statute is irrelevant and does not apply to the instant dispute.

However, the Court finds that Plaintiff has set forth evidence that it stored the nonconforming boats after rejection and that it did so from September 2019 to October 2020. (Doetsch Dep. 330:5-333:14).  In addition, Plaintiff has put forward evidence that Plaintiff has received a bill from "Waterford Road, LLC," the owner of the storage yard, for the storage of the boats. (Doetsch Aff. ¶ 21). Construing all of this evidence in the light most favorable to Plaintiff, the Court finds that a reasonable juror could conclude that Plaintiff is entitled to storage fees consistent with Section 2-715.

Accordingly, the Motion is denied with respect to damages identified as Category No. (9).

**E. Breach of Warranty: Counts II and III**

Defendant asserts that Plaintiff cannot prevail on its breach of warranty claims (Count II and Count III) because Plaintiff elected to reject the allegedly nonconforming boats. Specifically, Defendant maintains that it is entitled to summary judgment with respect to Counts II and III because "a breach of warranty action and one where a party rejects goods under the UCC are mutually exclusive." (Motion, pp. 21, 23-28).

In the Opposition, Plaintiff first asserts that Plaintiff is not barred from pursuing the breach of warranty claims pursuant to the UCC. However, Plaintiff does concede that it rejected the

allegedly nonconforming boats. Despite this fact, Plaintiff contends that its rejection of the boats does not prevent it from pursuing breach of warranty claims and recovering damages related thereto pursuant to UCC §§ 2-711, 2-713, and 2-715. (Opposition, pp. 26-30; *see also* ECF No. 69-8).

The conditions under which a party may recover on a breach of warranty action, express or implied, are outlined in UCC § 2-714, which provides as follows:

> (1) Where the buyer has accepted goods and given notification (subsection (3) of § 2-607) he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.
> (2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.
> (3) In a proper case any incidental and consequential damages under the next section may also be recovered.

UCC § 2-714. The plain language of this provision makes clear that the measure of warranty damages is established by comparing the value of *accepted* goods and the value that the goods would have if they were delivered as warranted.  *See also Addressograph-Multigraph Corp. v. Zink*, 329 A.2d 28, 33 (Md. 1974) (breach of warranty claims measured by comparing value of accepted goods and goods as warranted).

In addition, various courts and legal commentators have endorsed the proposition that a party may not reject goods and simultaneously pursue a breach of warranty claim. *See, e.g.*, *Stewart-Decatur Sec. Sys., Inc. v. Von Weise Gear Co.*, 517 F. 2d 1136, 1150 n. 9 (8th Cir. 1975) ("A warranty claim would arise under the [UCC] only after the goods had been accepted"); *Kelly v. Olinger Travel Homes, Inc*., 117 P.3d 282, 288 (Or. Ct. App. 2005) ("Not only must a buyer accept the goods [to recover breach of warranty damages] but, because damages for breach of warranty are designed to compensate for the diminished value of retained goods, the buyer also

must not revoke acceptance"); *Kirby v. NMC/Continue Care*, 993 P.2d 951, 954 (Wyo. 1999) (same); *see also* DAVID FRISCH LAWRENCE'S ANDERSON ON THE UNIFORM COMMERCIAL CODE (3d ed. 2022) ("A buyer cannot both reject or revoke acceptance of the goods and obtain breach of warranty damages"); *Damages for Breach of Warranty*, *in* CORPORATE COUNSEL'S PRIMER (2019) (breach of warranty claim "may only be maintained after the goods have been accepted by the buyer").

Here, because the Plaintiff has conceded that it rejected the allegedly nonconforming boats, there is no evidence before the Court from which a reasonable jury could find for Plaintiff on its breach of express and implied warranty claims.

In sum, because the facts before the Court, even when viewed in Plaintiff's favor, show that Plaintiff rejected the allegedly nonconforming boats, Plaintiff is precluded from pursuing the breach of warranty claims as a matter of law.  Accordingly, the Motion is granted with respect to Plaintiff's breach of warranty claims.

### F.  Negligent Misrepresentation-Count V

Defendant advances two arguments in support of an award of summary judgment on Count V. First, that Plaintiff's negligent misrepresentation claim must fail as a matter of law, because Plaintiff has failed to discover admissible evidence to support the allegation. Second, assuming, *arguendo*, that Plaintiff can put forth admissible evidence to support Count V, certain categories of damages that Plaintiff seeks are not proximately related to any alleged negligent misrepresentations made by the Defendant. (Motion, pp. 23-28).

Plaintiff counters that it developed evidence to support two misrepresentations negligently made by the Defendant, which are proximately related to Plaintiff's harm. Specifically, that the boats at issue: (1) are certified by the NMMA; and (2) are self-bailing. (Opposition, pp. 30-34).

To prevail on a negligent misrepresentation claim, a party must prove the following elements:

> (1) The defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;
> (2) The defendant intends that his statement will be acted upon by the plaintiff;
> (3) The defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;
> (4) The plaintiff, justifiably, takes action in reliance on the statement; and
> (5) The plaintiff suffers damage proximately caused by the defendant's negligence.

*Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*, 130 A.3d 1024, 1046 (Ct. Spec. App. Md. 2016).

With respect to the claim that Defendant negligently misrepresented that its boats are certified by NMMA, Defendant asserts that Plaintiff cannot establish that Nicholas Doetsch, who ultimately executed the Agreement, relied on a statement regarding NMMA certification. (Motion, p. 25). On this point, the Court agrees with the Defendant. Mr. Doetsch testified about the information he relied upon when entering into the contractual agreement with Defendant and, subsequently, when placing an order for the 2020 Liner Series boats. When testifying about the information that he relied upon, Mr. Doetsch testifies as follows:

> Q: But in terms of the order itself, the approximately 20 Liner Series that Pasadena Boat Works ordered shortly after the meeting in Waycross, Georgia, what were you relying on in terms of making the decision to order those Liner Series boats?
> A: Marty Castle's representation, Joe Kirkland's representation, Ray Smith, Tony Horn. Everyone's representation to us that this is the evolution, you need to be part of this. This is what is the future of Carolina Skiff.
> …
> Q: -- what had you heard prior to making that order in June of 2019?
> A: Prior to making this order, Joe Kirkland represented the line as having the self-bailing feature. I was able to have a one-on-one with Joe Kirkland specifically.
> …
> Q: So you weren't relying on anything Mr. Kirkland said to you in that one-on-one conversation when you made the decision to put an order for 20 of the [Liner Series boats] for model year 2020; is that right?

A: I would not agree with that. I would say that he had already represented it as being self-bailing. And then I got confirmation from him that he did design all of these boats, and he was very proud of it.

(Duplicate of Doetsch Dep. 93:2-12, 94:19-95:3, 97:2-11). Therefore, according to Mr. Doetsch's own testimony, he relied on generalized representations: (1) about the evolution of Defendant's boats; and (2) that the 2020 Liner Series boats had a self-bailing feature. (Duplicate of Doetsch Dep. 93:2-12, 94:19-95:3, 97:2-11). According to his own testimony, he did not rely upon representations relating to the NMMA certification before purchasing the boats. Equally important, the evidence before this Court is that at the time that Mr. Doetsch signed the Agreement at the Dealer Meeting, none of the boats there had an NMMA certification label. (Robert Bass Aff. ¶ 5). As such, the Court finds that even when viewing the evidence in the light most favorable to the Plaintiff, Plaintiff has set forth no evidence from which the Court can infer that Plaintiff relied on statements related to the NMMA certification or stickers before deciding to purchase the boats.[9] Accordingly, the Motion is granted with respect to the negligent misrepresentations made regarding the NMMA certification issue.

With respect to the negligent misrepresentations regarding the self-bailing feature, the Court reaches a different result. As detailed above, Mr. Doetsch testified that at the June 23, 2019 Dealer Meeting, before ordering boats from Defendant, Mr. Kirkland told him about the self-bailing nature of the boats. (Duplicate of Doetsch Dep. 94:19-95:3, 97:2-11). Mr. Doetsch also testified that he relied on this representation when signing the Agreement, and when subsequently placed an order for Liner Series boats. At this procedural juncture, when viewing the evidence in the light most favorable to Plaintiff, the Court holds that a reasonable juror could credit Mr. Doetsch's testimony and find that Plaintiff relied on Mr. Kirkland's representations that the boats

---

[9] This is the same issue addressed by Chief Judge Bredar in his Order ruling on the prior Motion to Dismiss. (*See* ECF No. 27, pp. 5-7).

were self-bailing before he entered into a contractual arrangement to purchase the 2020 Liner Series boats.

Accordingly, summary judgment with respect to the "self-bailing" issue outlined in Count V is denied. Relatedly, the Court must also reject the argument that damages associated with Count V are not proximately caused by Defendant's negligence.

## IV.   CONCLUSION

For the foregoing reasons, the Motion is **DENIED IN PART, GRANTED IN PART**. The Motion is **DENIED** with respect to: (1) Count I, Breach of Contract damages described as Category No. (9); and (2) the Count V, Negligent Misrepresentation claim related to statements concerning the 2020 Liner Series boats' self-bailing capabilities. The Motion is **GRANTED** with respect to: (1) Count I, Breach of Contract claim related to damages identified as Category Nos. (1)-(8); (2) Count II, Breach of Express Warranty; (3) Count III, Breach of Implied Warranty; and (4) Count V, Negligent Misrepresentation, related to statements concerning the NMMA certification.

A separate Order will follow.

Dated:  September 25, 2023

_____/s/_____
The Honorable Gina L. Simms
United States Magistrate Judge